UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PRIMERICA LIFE INSURANCE COMPANY, <br><br>                 Plaintiff, <br><br> v. <br><br> MADISON DARNEY and YVETTE DARNEY, <br><br>                 Defendants. | Case No. 1:23-cv-00554-DCN <br><br> **MEMORANDUM DECISION AND ORDER** |
| YVETTE DARNEY, <br><br>                 Cross-Plaintiff, <br><br> v. <br><br> MADISON DARNEY, <br><br>                 Cross-Defendant. | |
| MADISON DARNEY, <br><br>                 Counterclaimant, <br><br> v. <br><br> PRIMERICA LIFE INSURANCE COMPANY, <br><br>                 Counter-Defendant. | |

# I. INTRODUCTION

Before the Court is Defendant Madison Darney's ("Madison") Motion for Summary Judgment (Dkt. 31) and Defendant Yvette Darney's ("Yvette") Motion to Amend/Correct Responses to Admissions (Dkt. 35). On December 19, 2024, the Court held oral argument and took the motions under advisement. Upon review, and for the reasons set forth below, the Court GRANTS Madison's Motion for Summary Judgment and DENIES Yvette's Motion to Amend/Correct Responses.

# II. BACKGROUND

The catalyst of this lawsuit is the life insurance policy of Brett Darney ("Brett"), who died on December 4, 2022, after he went into cardiac arrest. Dkt. 31-2, at 67. Yvette, Brett's estranged wife, and Madison, Brett's adult daughter, have asserted competing claims to the Term Life Insurance Policy ("Policy") valued at $250,000.

Brett purchased the Policy on April 1, 2015, which required monthly payments of $47.05 to Primerica Life Insurance Company ("Primerica"). Dkt. 31-3, at 2. As a term life insurance policy, the payment of the monthly premium created a unilateral contract which provided protection for a specified period, in this case one month, before automatically terminating. Dkt. 31-4, at 4; *See Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Trust*, 206 P.3d 481, 488–89 (Idaho 2009). Therefore, every time Brett paid a monthly premium, he created a new unilateral contract with Primerica which provided him coverage for the next month.

In September 2015, Brett married Yvette, and he named her as primary beneficiary of the Policy. Prior to their marriage, they entered into a prenuptial agreement. Dkt. 31-3,

at 2. As part of that agreement, both parties could sell, transfer, or dispose of any separate property without the consent of the other party. Dkt. 31-2, at 24. The agreement also specified that "any debt, obligation or liability incurred during the marriage in [Brett's] name" would be paid for with his separate property. *Id.* at 20. The agreement also contained a standard obligation to support clause. *Id.* at 21. Brett and Yvette separated seven years later in September 2022, and Brett moved in with his mother, Debra Reynolds ("Debra"). Dkt. 31-3, at 3.

Several legally significant events occurred in the weeks following Brett and Yvette's separation. First, on September 12, 2022, five days after moving in with Debra, Debra conveyed to Brett $10,000 drawn from a line of credit she had previously taken out with Idaho Central Credit Union ("ICCU"). *Id.* Later that same day, Brett opened a new and separate bank account at ICCU where he deposited the $10,000—$5,000 in a checking account and $5,000 in a savings account. *Id.*; Dkt. 31-2, at 50. On September 14, 2022, Brett deposited his regular paycheck from his work at JST Manufacturing into the new checking account. Dkt. 31-3, at 4. Finally, on September 19, 2022, Brett filed a petition for divorce from Yvette in Idaho State Court and made Madison the 100% primary beneficiary of the Policy. Dkt. 31-3, at 4.

Over the next few months, Brett continued to deposit his paychecks into the ICCU account, Dkt. 31-2, at 51–61, and used it frequently, including for purchases at restaurants, retail stores, Amazon, and for paying child support. Dkt. 31-2, at 52–61. Among the expenses Brett charged to his ICCU account were his insurance premiums to Primerica in October and November 2022. *Id.* at 56, 60. It is the latter payment of $47.05 on November

15, 2022, which created the unilateral contract with Primerica for coverage during the month of December 2022 when Brett died.

From the time Brett opened the checking account in September 2022 until he died, Brett deposited $8,187.17 of his paychecks into the account, as well as $8,400[1] of the $10,000 he received from Debra, and $1,210.50 from Yvette for his half of their tax return. Dkt. 31-3, at 6. During that same period, Brett withdrew $16,162.59 from the account, and his withdrawals exceeded his income from his paycheck each month. *Id.*

Both parties agree "that the source of the funds used to pay the life insurance premium the month before Brett died is dispositive to the nature of the life insurance policy proceeds (i.e. community or separate)." Dkt. 34, at 3. However, the parties disagree on whether the money Brett received from Debra was community property. And even if the loan was separate property, Yvette argues Madison has not overcome the presumption that commingling the loan proceeds with Brett's paychecks converted the loan proceeds into community property. *Id.* at 4. Madison counters by claiming community expenditures exceeded Brett's paychecks as community income, and under the accounting theory, any residual amount is separate property. Dkt. 31-4, at 8–10.

Primerica brought this suit as an interpleader action, asking the Court to accept the $250,000 life insurance proceeds into its registry and determine the Defendants' rights as to those proceeds. Dkt. 1. Yvette filed an Answer and Crossclaim, claiming that she is

---

[1] In addition to the $5,000 Brett originally deposited directly into his checking account on September 12, 2022, he later transferred $2,500 from his savings to his checking on October 22, 2022, and $900 on November 16, 2022.

entitled to 50% of the proceeds (or $125,000) as the spouse of the decedent. Dkt. 6. Madison also filed an Answer, claiming that she is entitled to the full $250,000, as the sole beneficiary under the policy. Dkt. 9.  Primerica then filed a stipulated motion to deposit 50% of the proceeds into the Court and paying the balance of the proceeds to Madison. Dkt. 23.

This leaves a dispute between Yvette and Madison regarding the $125,000 deposited into the Court. The Court scheduled a Settlement Conference before Magistrate Judge Debora K. Grasham, but only Primerica showed up for that Settlement Conference. Dkt 29 and 30. Judge Grasham vacated the Settlement Conference because both parties' defense counsel failed to appear.

Madison now moves for summary judgment. Dkt. 35. Yvette counters that the parties' disagreement regarding the nature of the loan proceeds creates a dispute of material fact defeating Madison's motion. Dkt. 34, at 6–7. Separately, Madison seeks to strike a portion of Yvette's declaration filed in support of her Response; namely, Yvette's claims that Debra sought repayment of her loan to Brett from her shortly after Brett's death, and that she was sure Debra was seriously requesting repayment at the time. Finally, Yvette has filed a Motion to Amend or Withdraw Admissions related to Yvette's obligation (or non-obligation) to repay Debra's loan to Brett. Dkt. 35-2.

### III. LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). The Court does not weigh the evidence and determine the truth of the matter but rather determines whether there is a genuine issue for trial. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). In considering a motion for summary judgment, the Court must "view[] the facts in the non-moving party's favor." *Id.* The non-moving party must only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* The non-moving party cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment but must set forth specific facts, supported by evidence, with reasonable particularity that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

The Court may only consider admissible evidence in ruling on a motion for summary judgment. *Guion v. Bonner Homeless Transitions Board of Directors*, 2020 WL 1666765, at *4 (D. Id. 2020); *see also Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Under the Federal Rules of Evidence, hearsay is not admissible. Hearsay is a statement that: (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the truth of the matter asserted in the statement. Fed. R. Ev. 801(c). Additionally, under Rule 602, witness may only offer evidence when they have personal knowledge of the matter. Fed. R. Ev. 602.

When a party moves to strike evidence from the record, the Court may deny such motion if the documents could be relevant later in the case. *See Craig H. v. Blue Cross of Idaho*, 2024 WL 1975507, at *5 (D. Idaho May 2, 2024). Rather, the Court can forego

consideration of the documents (or portion of the documents) for the purposes of the present motions. *Id.* (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

### B. Idaho Family Law

Idaho is a community property state. Idaho Code § 32-903. All property acquired by a husband or wife during a marriage is presumed to be community property. Idaho Code § 32-906; *Baruch v. Clark*, 302 P.3d 357, 362 (Idaho 2013). If a party wishes to overcome that presumption, he or she "bears the burden of proving with reasonable certainty and particularity that the property is separate property." *Id.* (citing *Barton v. Barton*, 973 P.2d 746, 748 (Idaho 1999)). However, "[w]here parties enter into a valid antenuptial agreement, their property rights are determined by that agreement and not by the Idaho Code provisions dealing with community property rights." *Weilmunster v. Weilmunster*, 858 P.2d 766, 774 (Idaho Ct. App. 1993). In other words, a prenuptial agreement can overcome the presumption of community property.

### 1. *Term Life Insurance Policies*

When a life insurance policy is "acquired after marriage and . . . the premiums are paid with community funds, [that policy] is community property." *Travelers Insur. Co. v. Johnson*, 544 P.2d 294, 298 (Idaho 1975) (cleaned up). In these situations, if the beneficiary of a decedent spouse is not the surviving spouse, the surviving spouse may void the gift of proceeds as to one-half. *See id.* However, if the policy premiums are paid with separate property, the beneficiary of the policy is entitled to the entirety of the life insurance proceeds. *See id.*

MEMORANDUM DECISION AND ORDER - 7

Term life insurance policies are "a series of unilateral contracts, each beginning with the payment of a premium for a specified period . . . and terminat[ing] at the expiration of that . . . period." *Banner Life Ins. Co. v. Mark Wallace Dixson Irrevocable Trust*, 206 P.3d 481, 489 (Idaho 2009) (quoting *Guy v. Guy*, 560 P.2d 876, 878 (Idaho 1977)). The Idaho Supreme Court has adopted the risk payment theory to classify such policies as either separate or community property. "Under the theory, the character of life insurance policy proceeds is determined by the source of the funds used to pay the risk portion of the policy, which for a term life insurance policy is the last policy premium." *Banner*, 206 P.3d at 489 (cleaned up). Thus, a presumption that the proceeds of a policy acquired during a marriage are community property can be overcome by a showing that the last premium was paid with separate property. *Id.*

### 2. *Loans Made During Marriage – Community or Separate*

The community property presumption also applies to debts incurred during marriage. *See Simplot v. Simplot*, 526 P.2d 844, 851 (Idaho 1974). When one spouse takes out a loan, the nature of the loan proceeds determines the nature of the debt, and the community debt presumption can only be overcome where there is proof "with reasonable certainty and particularity that the proceeds of the loan were . . . separate property." *Gardner v. Garder*, 691 P.2d 1275, 1277 (Idaho Ct. App. 1984) (citing *Winn v. Winn*, 673 P.2d 411, 414 (1983)).

To determine the nature of the proceeds of a loan, one must look to the basis of the extension of the credit. *Winn*, 673 P.2d at 414. Where is secured by a spouse's separate estate, the proceeds are separate. *Speer v. Quinlan*, 525 P.2d 314, 325 (1974); *Lepel v. Lepel*,

456 P.2d 249, 253 (1969); *Shovlain v. Shovlain*, 305 P.2d 737, 739 (1956). When a loan is secured by and repaid from the community estate, the proceeds are community property. *See Speer*, 525 P.2d at 325.

### 3. Commingling

When separate and community property are commingled, separate property is not automatically converted to community property. *Batra v. Batra*, 17 P.3d 889, 896 (Idaho Ct. App. 2001). Rather, if separate property is identifiable through direct tracing or accounting, separate property will remain separate. *Id.* (citing *Barton v. Barton*, 973 P.2d 746, 748 (Idaho 1999); *Weilmunster*, 858 P.2d at 771). Under the accounting method, a court may compare the aggregate community deposits with all community expenditures, and if the expenditures exceed the deposits, the residual funds are separate property. *Josephson v. Josephson*, 772 P.2d 1236, 1239–40 (Idaho Ct. App. 2001). When determining whether separate or community funds were used for a particular purchase, the person asserting the purchase was made with separate funds has the burden of presenting evidence that there were insufficient community funds for the purchase on the day of the transaction. *See Batra*, 17 P.3d at 897–98. This can be done by presenting evidence of the community or separate purpose of any withdrawals from the account. *Id.* at 897.

### C.  Withdrawing or Amending Response to Requests for Admissions

Rule 36(b) permits, but does not require, the Court to approve a party's withdrawal of admissions. *Conlon v. U.S.,* 474 F3d. 616, 624 (9th Cir. 2007). A response to a request for admission may not be amended or withdrawn unless: (1) the presentation of the merits of the action will be subserved, and (2) the party who obtained the admission fails to satisfy

the court that withdrawal will prejudice that party in maintaining the action or defense on the merits. *Id.* Prejudice may be found where the party who obtained the admission took steps in reliance on the responses such as cancelling depositions. *See Hadley v. United States*, 45 F.3d 1345, 1348 (9th Cir. 1995).

The Ninth Circuit has held that Rule 36(b) does not require a court to grant relief even when the moving party can satisfy the two-pronged test. *Conlon*, at 624. However, a court's failure to consider the two factors will be considered an abuse of discretion. *Id,* at 625.

## IV. DISCUSSION

At the outset, the Court must clearly define what evidence it will be considering in determining whether there are genuine issues of material fact. The Court is only able to consider admissible evidence when ruling on a summary judgment motion. *See Guion*, 2020 WL 1666765, at *4. Thus, the Court must ignore any inadmissible evidence Yvette presents to defeat Madison's request for summary judgment.

In Yvette's declaration in support of her response to the instant Motion, she claims Debra told her immediately after Brett died in the hospital that she "owed her $10,000 for money she had 'given' to Brett." Dkt. 34-1, at 2. Yvette also claims Debra's Declaration, which was filed concurrently with Madison's Motion for Summary Judgment, confirmed that Debra was seriously requesting Yvette repay the $10,000 loan she made to Brett. *Id.* at 2–3. Madison argues that both statements are inadmissible hearsay and should be ignored. Dkt. 37, at 7–8.

MEMORANDUM DECISION AND ORDER - 10

The Court agrees with Madison that Yvette's first statement above (that Debra told her she owed her $10,000 for the money she gave to Brett) is hearsay. It is a statement made outside of the current proceeding (i.e., in a hospital) and it is being offered to prove Yvette was responsible for the loan to Brett such that the loan would be a community debt. This is hearsay, and Yvette has not pointed to an applicable hearsay exception. The Court is thus unable to consider the first statement. *See Guion*, 2020 WL 1666765, at *4.

The second statement—that Debra's declaration supports Yvette's assertion that Debra "seriously" asked Yvette to repay the $10,000—presents two issues. Yvette wants the Court to read Debra's declaration in light of the first statement. But as already discussed, the Court cannot consider the first statement, so it follows the Court cannot consider Yvette's requested inference that Debra was requesting repayment of Brett's loan "very seriously." Dkt. 34-1, at 2–3.

Second, even if the Court was permitted to consider it, Yvette's inference does not necessarily follow from the evidence in this case. As both parties have acknowledged, Debra has made no attempt to collect on the loan either from Yvette or from Brett's estate since he passed. If fact, in Yvette's own words, she says that Debra called the $10,000 a gift. Even if the Court were to consider Debra's statement in the hospital requesting repayment of the loan, and even if it were true, she has maintained throughout the proceedings the loan was to Brett, and he was the one responsible for repayment. This position, coupled with her non-action on collection of the loan proceeds, indicates Yvette does not have sufficient personal knowledge to claim Debra was genuinely suggesting Yvette was responsible for the loan.

MEMORANDUM DECISION AND ORDER - 11

While the Court will not consider Yvette's statements for purpose of the present Motion, the statements could be relevant later in this case. Therefore, the Court will not strike them from the record.

### A. Community and Separate Property in Brett's Account

The Court agrees with both parties that the crux of this case is whether the insurance premium paid to Primerica in November 2022 was paid with community or separate property. This is consistent with the risk payment theory established in *Banner*. Because valid prenuptial agreements take precedence over traditional principles of community property in Idaho, the Court will begin with Brett and Yvette's prenuptial agreement for guidance as to the nature of the funds in Brett's ICCU account.

Both parties concede the deposits in Brett's account are from three sources—Brett's paychecks from his employment, his separate share of the tax refund, and loan proceeds from the $10,000 Debra loaned Brett. Both parties also seem to concede in briefing that Brett's income is community property. This is not correct. The prenuptial agreement dictates otherwise. In Section II of the prenuptial agreement it states, "The term 'separate property of the Husband' shall refer to all of: . . . his earnings . . . including, but not limited to, salaries . . . and similar compensation and income derived from his employment." Dkt. 31-2, at 15–16. The only time when Brett's earnings can become community property under the prenuptial agreement is when "either party hereto shall deposit with any financial or similar institution during the marriage in a depository or brokerage account *in the names*

*of both Husband and Wife . . . .*" Dkt. 31-2, at 17 (emphasis added).[2]

Brett's account at ICCU was exclusively in his name. *See* Dkt. 31-2, at 50. Once he filed for divorce in September 2022, all of his paychecks were deposited into the ICCU account. Yvette is not named on that account. Therefore, under the prenuptial agreement, all of Brett's earnings from JST Manufacturing which were deposited in the ICCU account were his separate property.

Brett's share of the income tax refund was also his separate property. The prenuptial agreement specified that Brett's earnings were his separate property, Dkt. 31-1, at 33–34, and that Brett was solely responsible for tax obligations arising from his separate interests. Dkt. 31-1, at 37–38. The tax refund was separate property (i.e., withheld earnings) set aside in a non-Community Property Account (i.e., held by the IRS) for the purpose of paying a separate obligation. Because Brett never deposited his half of the refund into a Community Property Account, the refund never became community property according to the terms of the prenuptial agreement.[3]

The money Debra conveyed to Brett is not easily defined as community or separate property. It is unclear whether the proceeds were a gift to Brett or a loan. If the money was

---

[2] Thus, the funds in the Wells Fargo account were community property funds because that account was in the names of both Brett and Yvette.

[3] While the record is not clear as to whether Yvette deposited the refund into a Community Property Account prior to transferring Brett's half to him, the legal characterization of the refund would not change either way. The prenuptial agreement states that community property includes separate property transferred by "either party" into a Community Property Account. Dkt. 31-1, at 35. The most natural interpretation of the "either party" clause is that either spouse may transfer *his or her own* separate property into a Community Property Account, thereby transforming it into community property. It would be strange indeed if the agreement empowered one spouse to deposit the other's separate property—without that spouse's knowledge or consent—in a Community Property Account and thereby convert it into community property. Thus, the Court finds that, even if Yvette initially deposited the refund into a Community Property Account, such a deposit would not affect the refund's status as separate property.

a loan, then its characterization depends on whether Brett's separate property was both the security and the contemplated source of repayment for the loan. *Speer*, 525 P.2d at 325. Debra has stated in her affidavit supporting the instant Motion that her reason for giving the loan was because Brett had no money to his name, which she had confirmed by looking at his account balance. Dkt. 31-2, at 3. Brett deposited the money five days after he separated from Yvette and moved in with Debra. *Id.* Based on Debra's affidavit[4] she loaned the money directly to Brett, expecting that he and he alone would repay her.

Yvette argues the loan from Debra was community property using several different theories. Debra explained she loaned Brett money due to his lack of access to community funds, and Brett's other money had been taken by Yvette into her personal accounts. Dkt. 31-2, at 3. Yvette claims this assertion indicates community funds were a contemplated source of repayment once Brett had restored access. Dkt. 34, at 5. Yvette also claims Debra has never attempted to collect from Brett's estate, so any repayment would have to come through community funds. *Id.* Additionally, Yvette claims the community would have been liable for any default on the loan had Brett survived and the divorce not been finalized due to the mutual support clause in the prenuptial agreement. *Id.* at 6.

The Court will take each contention in turn.

First, Yvette's interpretation of Debra's statements is not reasonable. Debra did not imply that Brett would repay her using community funds once he was afforded access to

---

[4] Debra's assertions that she expected repayment solely from Brett are not hearsay like Yvette's statements. She is attesting to her understanding of the agreement, not any out of court statements from her or any other person. Thus, the Court can consider her assertions as evidence here.

MEMORANDUM DECISION AND ORDER - 14

his share of the funds. If anything, the statements indicate Debra was concerned about Brett's financial stability as his divorce proceedings moved forward, and she was willing to assist him until a resolution could be reached. At that time, the implied resolution would be the finalization of the divorce, and Brett's portion of community funds would be separate property once more. Additionally, as the Court has already discussed, the money Brett was depositing in his ICCU account from his paychecks was separate property, and it is possible his earnings were the contemplated source of repayment once Brett was more financially stable, even if divorce proceedings were not finalized. In other words, Debra's affidavit does not establish her loan to Brett was a community debt.

Second, Debra's failure to seek repayment from Brett's estate does not automatically indicate she is contemplating repayment of the loan from Yvette. The classification of a debt as community or separate property is dependent on the contemplated security and source of repayment at the time the loan was given. It does not matter whether Debra would need to seek repayment from Yvette at this time to recover anything, but rather what Debra intended at the time she gave the loan. Thus, Debra's subsequent acts are not probative of whether the loan is a separate or community debt.

Finally, the mutual support clause of the prenuptial agreement does not automatically indicate that Yvette would have been liable for the loan, whether Brett had lived or not. The mutual support clause only relates to the "obligation to provide proper and adequate care, support, and maintenance for each other during the course of their marriage." Dkt. 31-2, at 21. Care, support, and maintenance does not automatically implicate an obligation to repay separate debt obligations. In fact, another section of the

prenuptial agreement is much more relevant here and directly contradicts Yvette's argument. "[A]ny debt, obligation, or liability incurred during the marriage in [Husband's] name, including penalties and interest . . . shall be paid from the separate property of the Husband." *Id.* at 19–20. Therefore, even if Brett had lived, and even if he had reconciled with Yvette, Yvette would not have been liable for the $10,000 loan from Debra.

Even though Yvette's arguments fall short of conclusively establishing the $10,000 as a community debt, there are other barriers which make the Court unable to grant Madison's Motion completely. First is the issue of whether the $10,000 was a debt or a gift. That is an issue for the factfinder. Second, traditionally, even separate debts of either spouse may be paid from community property, but the separate property of a non-incurring spouse cannot be obtained by a creditor to pay the separate debt of their spouse. *See Credit Bureau of Eastern Idaho, Inc. v. Lecheminant*, 235 P.3d 1188, 1192 (Idaho 2010); Idaho Code § 32-911. Brett and Yvette's prenuptial agreement indemnified each other from debts incurred separately; however, a creditor, or Debra in this case, would still be able to seek repayment from community funds. Thus, the very fact that Debra could have sought repayment from community funds because Brett and Yvette were still married means a reasonable juror could find this was a community debt because community funds could serve as security for the loan.

The Court again circles back to what is, at its core, a factual question: was Brett's separate property the security and contemplated source of repayment when Debra loaned him the money? Only a factfinder can resolve that disputed question, and summary judgment is not proper at this time. If this was a community debt, the community loan

funds were intermingled with Brett's separate property from his income, and the accounting theory must be employed to determine whether community funds were used to pay the Policy's last premium. Whether community expenses exceeded community income on November 15, 2022, is a question for the factfinder as well. Thus, summary judgment on this issue is not proper.

To summarize, the Court will grant summary judgment for Madison on a few limited issues. Namely, the prenuptial agreement executed between Brett and Yvette is valid and enforceable. The terms of the prenuptial agreement controlled the Policy purchased in November 2022 for the term of December 2022. Under that prenuptial agreement, the income Brett deposited into his ICCU account under his own name was his separate property. Whether the $10,000 from Debra was Brett's separate property is a question that must be answered by a factfinder. The Court will grant summary judgment in accordance with this paragraph.

### B. Yvette's Amendment to her Response to Request for Admission

The Court will not grant Yvette's Motion to Amend/Correct Responses. As Yvette notes, the requests for admission 10 and 11 which she seeks to withdraw or amend were answered just a few hours before Madison filed her Motion for Summary Judgment, and those admissions were used as a keystone in Madison's arguments. There is nothing wrong with the timing of the Requests for Admissions or Yvette's Answers to them. Yvette was represented by counsel when she answered the Requests for Admission. She has not shown that those answers are incorrect. Those Answers will stand.

Under the first of the *Conlon* factors, Yvette has not shown that the merits of the

MEMORANDUM DECISION AND ORDER - 17

action will be subserved if the admissions cannot be withdrawn. The Answers only go to Yvette's frame of mind at the time Brett died. They are not a statement of law or fact. As noted above, whether Yvette is obligated to repay Debra for her loan to Brett is a complicated question which contemplates issues of community property versus separate property and necessarily implicates other issues related to the life insurance policy. Yvette's answers are not conclusive on the issue of whether the loan was community or separate, but they are factors to be considered.

Under the second *Conlon* factor, as the party who obtained the admission, Madison failed to satisfy the court that withdrawal of the admissions will prejudice her in maintaining the action or defense on the merits. *Id.* The Court recognizes that prejudice may be found where the party who obtained the admission took steps in reliance on the responses such as cancelling depositions. Here, Madison filed a summary judgment motion the day the admissions were signed. However, with or without the admissions, the ultimate result is the same. There remains a genuine issue of material fact as to whether the $10,000 is (1) a separate property gift from Debra to her son; (2) a community property loan from Debra to the married couple that must be repaid by community property funds; or (3) a separate property loan from Debra to her son that must be repaid by his separate property.

Whether Yvette thinks she is liable to Debra for the loan is not dispositive of the nature of the loan proceeds and the ultimate result of using the accounting theory to determine whether the insurance premium was paid with community funds. The answers will stand, but they will not stand as a basis for summary judgment against Yvette. They are simply facts the factfinder must consider in determining whether the $10,000 "loan"

MEMORANDUM DECISION AND ORDER - 18

was separate or community property.

## V. CONCLUSION

There were three sources of funds in Brett's ICCU checking account: his paychecks from JNT Manufacturing, his separate property share of the tax refund, and proceeds from his mother. Brett's income was separate property, but it is unclear whether the loan proceeds were separate property, and that is ultimately a question for a factfinder to resolve. As such, there is a genuine dispute as to whether the Policy was Brett's separate property such that Madison is entitled to all if its funds or Brett and Yvette's community property such that Yvette is entitled to 50% of the funds and therefore, this case cannot be resolved on summary judgment at this time.

## VI. ORDER

**IT IS HEREBY ORDERED**:

1. Madison Darney's Motion for Summary Judgment (Dkt. 31) is **GRANTED** in **PART** and **DENIED** in **PART as outlined above**.

2. Yvette Darney's Motion to Amend/Correct Responses to Admissions (Dkt. 35) is **DENIED**.

DATED: September 22, 2025

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 19